Tobacco and Firearms. Just a second. I just want to say that we have a traffic light system and we'll appreciate your trying to adhere to it. Yellow light means you have two minutes left. Red light means we ask you to conclude your remarks unless the court is asking you a question. We have familiarized ourselves with the briefs, of course. We may not have the entire record or renewed the entire record, so we appreciate citations. With that, Mr. Ohlendorf. Good morning, Your Honors, and may it please the Court, John Ohlendorf for the appellants, and with the Court's permission, I'd like to reserve five minutes of time for As the Supreme Court held in Heller and Bruin and has now reaffirmed in Rahimi, the constitutionality of Section 922's ban on 18 to 20-year-olds' commercial acquisition of handguns must be assessed based solely on the Second Amendment's text and its history. Now, as I submitted to the Court the last time I was before you, Section 922's ban cannot survive that crucible. Let me, let me, how old are the plaintiffs in this case now? Yes, Judge Jones, the Court last year granted our request to supplement the record, which indicated to the Court that the named plaintiffs, the original named plaintiffs, Mr. Reese and, I believe, Ms. Nachwin, have aged out, but the two organizational plaintiffs retain a member, Christian Broussard, who is, he's currently 19 years old. I believe he will turn 21 and age out in 2026. So we would submit. We'll try to get a decision out before then. I'm sorry? We'll try to get a decision before then. We, we, we would greatly appreciate that, Your Honors. Along that line, and I'm not recalling exactly where it is in the briefs, but I think it would be helpful to have it for this recording. How did the cutoff line come to be 18 rather than just anyone under the age of 21? I'm not quite sure I, I get the meaning of your question, Judge Barksdale. Well, your, your whole case is 18 to 20 years old. You should be able to buy a handgun, and I'm asking why not 16-year-olds? 16-year-olds, I understand, Judge Barksdale. So obviously our, our plaintiffs are 18. We have not suggested, and the Court, I don't think, has to address whether 16-year-olds, for example, would, would have the right to, to keep and bear arms. We do think that would be a much harder question, and, and that's really based on primarily the, the militia acts that were enacted at, in 1792 at the federal level, and then within the first, you know, I believe the first three years all of the original colonies had coalesced in their militia laws at the age of 18 as the, as the minimum age for militia service. So we think that shows, number one, that people who are 18 and older, 18 to 20 years old, clearly had full Second Amendment rights, notwithstanding all of the evidence that my friend points to about, you know, the common law age of minority, the, the authority of parents and so forth. For people under 18, you don't have those militia laws providing that evidence. I'm not suggesting that this in any way has any bearing on the decision by this Court, but what is the current minimum age to join the United States Armed Forces? Your Honor, I, I believe it's 18. I'm not 100% sure. Certainly 18-year-olds can join the, the Armed Forces. As, as Your Honor's question suggests that I don't think that has much bearing here because, as Heller clearly says, the operative clause of the Second Amendment protects a, a right to, an individual right to keep and bear arms that's unconnected with militia service. We, we do think that under the Bruin Text and History Test, Section 920 2's age ban is plainly unconstitutional. My plaintiffs are Americans. They're 18 to 20-year-old Americans. They wish to acquire firearms, bearable arms, so that they can keep and bear them. So they are, we would submit, covered by the plain text of the Second Amendment. And as the government has effectively acknowledged, no state imposed any age-based firearm restriction of any kind until 1856, over 60 years after the Second Amendment was ratified. And so the nation's historical tradition cannot justify Section 920 2's ban. What do we do with the, with the 19th century laws? And if anything? So Judge Elrod, I, we would submit to you nothing. We would submit to you that the key date for discerning the Second Amendment's meaning is 1791. The 19th century laws, again, the earliest come more than 60 years after that date and, and can shed very little light on the understanding of the scope of the Second Amendment, the understanding of the, the scope of the nation's historical tradition at the time of ratification. Even if the court were to, to disagree with that and conclude that, you know, there's still some question about whether 1791, the Second Amendment's ratification, or 1868, the 14th Amendment's ratification is, is kind of the correct focal point for analysis. We, we still think these late, you know, 19th century laws, most of, most of their, the laws that they cite were enacted in the last decade of the 19th century. And, and Bruin clearly says, even acknowledging that that's an open question, the 1791 versus 1868 debate is an open question, even, even acknowledging that, Bruin says, if you have late 19th century evidence that contradicts founding era evidence, that's not entitled to any weight. And so I, I think even setting that, you know, that debate aside, which again, we think we win, but even setting it aside, the, the, my friend's late 19th century statutes, we think, just have no bearing in this case. If you were to prevail, you would want us to reverse and render? I think, I think there's no, really, any reason to remand back to the district court for further proceedings. I think. And I'm not foreshadowing, I'm just. Of course, of course, Judge Elrod. So I think we would, we would prefer, you know, a reversal and, and an order for entry of judgment in our favor, because I think, really, the only live issues in the case are ones that are squarely presented before this court and that this court has received briefing on and can resolve. You're going to touch on Rahimi? Yes, yes, Judge Jones. So we don't think Rahimi casts any doubt on the, on the conclusions that I, that I submitted to your honors last year. In fact, we think, in several respects, it bolsters them. Rahimi, we think, was really just a routine application of the text and history standard articulated in Broome, which, which Rahimi reaffirms. Rahimi does, to be sure, it clarifies that the founding era going armed laws are appropriate analogs for the provision of Section 922 that disarms those who pose a threat of domestic violence. And it clarifies that those founding era laws are appropriate analogs, notwithstanding the fact that they targeted a threat of public violence rather than private violence. But, but that line of analysis, we don't think, offers any help to the government here, because, again, the government has not identified any laws. It has no, it has zero age-based firearm restrictions at the founding. So the situation is totally unlike that in Rahimi. Rahimi also clarifies, I mean, Broome said this quite clearly, but, but Rahimi reaffirms that the court must look to the principles that underlie the nation's historical tradition, not just kind of the formal terms of the tradition itself. Well, here, even, even read for all their worth, all of the traditions and practices and sentiments that the government has pointed to at the founding and, and later, indeed, throughout the end of the 19th century, they're all based on the principle that actual minors who are within the care, custody, and protection of their parents may be treated differently in certain respects. And that principle has, has no application here to 18 to 20-year-olds today, to, to my clients, because 18 to 20-year-olds today are legal adults. They're independent from their parents. I don't understand that argument, frankly. Yes. I don't understand why you're transporting current standard back to the 18th century. And so, Judge Jones, the first point I'd make is I don't think you have to agree with me on this argument for, for us to prevail. We think, you know, the founding era evidence and the, the absence of any age-based restrictions at the founding, the militia laws, as, as Judge Jones, you outlined in your dissent from denial in the re-Bruin decision, all suffice. Those are all sufficient basis to, to reverse and rule for us. But let me try to convince you as to why we think the, the current age of majority does matter. And, and what I would do is I would draw an analogy to the way that the court in Heller and Bruin and Rahimi treated the technology of firearms, right? Heller says, well, handgun, Bruin says, well, handguns may have been dangerous and unusual weapons at the founding. We're not going to take a position on that, but it's possible they were so rare and so unreliable that they were dangerous and unusual, and indeed would not have been covered by the Second Amendment at the founding. But that's not what we look to. That's not the use that we make of history. We don't look to the specific applications of the Second Amendment at the founding. We look to the principle, and this is what Rahimi reaffirms. We look to the principle, and the principle is, if a firearm is in common use and, and therefore not considered dangerous and unusual, then it's covered. And so we look to see how that principle applies today. Well, handguns today are in common use, notwithstanding the fact that they may not have been at the founding. They're in common use today, and so the principle that the founders codified covers them today. They're protected by the Second Amendment today. Well, just so, whether someone who is 18 years old and as a, as a child of, of their parents and subsumed within the legal authority of their parents at the founding. You think, just for the sake of argument, do you think Ben Franklin was a legal minor when he started businesses in his teens? I, I think he, well, so what I would say, Judge Jones, is, and I think the evidence they cite, for example, Blackstone's commentaries. I understand that, but it seems to me the mortality rate being what it was in the 18th century, there were a lot of people between the ages of 18 and 21 who were orphans or at least whose fathers had died. And I find it very difficult to believe that they had no, you know, economic rights, at least. Yeah, I mean, I, I think, I, I'm just saying, I mean, this is out of the blue, I know, but I'm suggesting that this common law was superficial and perhaps overgeneralized. I, I totally agree with that, Judge Jones. I thought, I mean, I thought you might. You, you, you thought right. You thought correctly. So I, I, I definitely agree. I think we know from Blackstone that the age of majority differed based on what the underlying activity was, right? And so what, you know, what my friends refer to as the common law age of majority 21, that was kind of the terminal age of majority right. But up until that point, minors who lived with their families were considered to be within the care and custody of their parents, their father specifically, and within their protection, right? And so, but notwithstanding the fact that that may have been the case at the founding, it's not the case today. I just, I'm just not sure what to do with your, well, it's 18 today and argument under an originalist approach. It's what if it was 26 today because the prefrontal cortex is not fully formed or something and they, and there was some law in, um, interacted. You would not be saying that it should be 26 under those circumstances. So why are you saying, well, they say 18. And so that, that has some weight. Yeah. So I, I wouldn't be saying it and it's because of my principle theory, Judge Elrod, which is again, we know from the militia laws, we know from the absence of any age based restrictions, the 18 year old, notwithstanding their, their status at the common law, notwithstanding the age of majority, they had full second amendment rights. They were acquired and therefore able to acquire firearms. Uh, those were private firearms that they could keep in their homes, uh, bear in public. There were no age based restrictions on that conduct of any kind. Under my, my, my second and independence, but my secondary theory, um, I do think you would have to take a close look at as a practical matter, um, are 26 year olds for other purposes treated as minors? Uh, are they still living with their parents? The reason this matter is Judge Elrod, I would submit to you on, again, under the secondary theory, the reason it matters is, is because of how it connects up to the purposes of the second amendment. And we know that the, the, the, the core purpose of the second amendment is individual self defense. Um, if I am at home, you know, my, my, uh, 12 year old daughter, um, her need for personal self defense, uh, is, is sheltered by me. I and my wife are able to keep and bear arms and protect her because she is within our custody. She's, she's within our household. Uh, if, if it were really the case in some jurisdiction that 25 year olds, uh, were analogous to my 12 year old in that way, then yes, under the secondary theory, I think it would be an interesting question, um, whether applying the principle, uh, uh, uh, they, they would be covered by the second amendment. Again, setting aside the primary theory. Um, uh, uh, but, but if it's just as a formal matter, some state says, well, for second amendment purposes, we're going to treat them as, as minors, but for all other purposes, they're independent adults and they have their own equally acute need for self defense, uh, as any other adult. Uh, then I would say, no, that, that doesn't matter. You can't, um, you can't, uh, uh, use sleight of hand like that to try to carve out the second amendment in disregard for the very purposes that it was codified. Uh, you've only got about a minute left, but quickly, uh, explain how you think your case is affected by our post Rahimi decisions in Connerly, which was August the 28th and Diaz, which was September the 18th. So I don't think my answers will surprise you, Judge Barksdale. I think, uh, the court's decision in Connerly is very supportive of us. I think it, uh, I think it correctly applies. For example, the, the two steps of Bruin determines that at the first step, we just look at the plain text of the second amendment. Uh, if you're an American, then you are covered. I think that's equally the case here. And at the second step, we have to look for an analogous historical tradition and, and at the founding justice there, uh, the most analogous historical, uh, historical tradition, for example, the treatment of alcohol, people who were intoxicated by alcohol, uh, was not, uh, uh, analogous both in terms of the, of the how and the why. Uh, so to here, uh, really a fortiori, since there are no age-based restrictions at the founding, there's no, um, there's no adequate analog. I think the, the court's decision in Diaz, I don't really think has any bearing on this case. I mean, that dealt with, um, uh, you know, um, right. Felons in possession and it determined, um, determined that there was a history of capital punishment of thieves, uh, right. And that that kind of greater punishment subsumed and included the lesser punishment of disarmament. I, frankly, I have some quarrels with the court's historical analysis in Diaz, but they're not quarrels that I think have any bearing on, on this case. Because again, the, the, the, my friends in the government, they haven't come up with any founding year restriction. You have opportunity for rebuttal, Mr. Hazel. Good morning, your honors. May it please the court, Steven Hazel for the government. Rahimi confirms that the limited restrictions at issue here are permissible. The enduring principle that emerges from the historical record is that legislatures can enact age qualifications on the commercial sale of handguns. Age 21 lies within the range accepted at the founding throughout the 19th century and in modern times. And while Rahimi supports the government's position, it undermines plaintiffs. Rahimi precludes their piecemeal approach to history and instead requires a review of the full historical record. And Justice Kavanaugh's concurrence in particular leaves no room for their theory that this court should ignore all 19th century history. The court should affirm. Judge Barrett doesn't exactly do the same thing though. Justice Barrett recognizes that post-ratification history can be important, including in situations like this. But she says that surrounding the founding is most important. Your honor, she focuses on the founding. She also recognizes that the Supreme Court in case after case has also looked to post-ratification history. There's a couple of theoretical reasons for that. One is this liquidation theory that the court recognized in Bruin. Another is simply that people in closer in time to the ratification have a better understanding of what these amendments mean than people hundreds of years later today. And I'd point this court to Justice Kavanaugh's concurrence in particular. He identifies dozens of Supreme Court decisions that have looked at this kind of history. He notes that the framers themselves intended that in interpreting these provisions, we would look to the same. He didn't write the majority opinion, did he? That's true, your honor. He concurred in it, didn't he? That's absolutely correct, your honor. That's correct, your honor. I mean, this is a problem with separate opinions, but anyway. Your honor, the reason that I'm highlighting this is that he goes in depth into this question, into the theoretical and doctrinal reasons that this history is important. No justice disagreed, and the other side really hasn't answered. He didn't write, but that's not the majority opinion. That's right, your honor. Well, why don't you then go to the sources and not just what he says the sources are? Absolutely, your honor. So I think Rahimi helps to illustrate why the historical laws that we've put forward are more than sufficient. In Rahimi, there were a number of differences between 922G8 and things like surety laws. Here the historical laws and these modern restrictions really have the same limits. They're focused on the same purchasers, the same group of commercial sellers. They focus on the same weapons, handguns. What's the limit on your theory that if you restrict commercial sales, somehow that doesn't interfere with the purchaser's Second Amendment right? So your honor, our theory is more specific than that. The theory is that for 18 to 20 year olds, history shows that legislatures can restrict their commercial sale of weapons. That's consistent with this common thread that we've identified. But the only history you have for that, as he said, my understanding is one law pre-Civil War and the rest in the late 19th century, right? That's not right, your honor. So let me talk about our founding era evidence. We have a number of age qualifications at the founding on other activities. So these sorts of age qualifications were normal. There's absolutely no evidence that anyone at the legislature couldn't enact these kind of age qualifications on the First Amendment, the Fourth Amendment, the Eighth Amendment rights at the founding. Your honor, there were age qualifications on some of those, those things, things like contracts, things like that. I was talking about inherent rights that were codified in the Bill of Rights. Were those age related? Your honor, are you asking about the other words? The Second Amendment right we know is an individual right. And you're saying because there were conventional rights under the common law or by legislature and derogation of the common law that had to do with minority or contract, that somehow those were allowed to narrow the scope of an inherent right like the Second Amendment right to bear arms. Your honor, I think it's common ground in this case that some age qualifications on the right to bear arms are permissible. I mean, whether it's 16 or 18, everyone seems to agree that's true. And so the question for the court is not whether they're permissible, but where to draw the line. And we think that sort of however one frames that historical principle, we win. I mean, if you use a similar level of generality as Rahimi, it's something like reasonable age qualifications. If you look at this more narrowly at a more specific level of generality, it's something like 18 to 21. That's where the line has been drawn for as long as American legislators have been drawing it. Today, I'll just point to the state's amicus brief. More than 30 states draw the line for various activities related to arms at 21. And that's not just true for arms bearing. There's a number of other activities where age 21 is still the line, right? Things like gambling, drinking, cigarettes. This is still within the range accepted. Nobody's yet said that you have a constitutional right to gamble, drink, or use cigarettes. That's true, Your Honor. And in fact, yes. That's true, Your Honor. Each of these different rights has a different history. That's what Bruin makes clear. And each has a different scope. And what the history... Of course, another powerful indicator in Rahimi was that the limitation in question was directly connected to what was considered to be dangerous conduct. That's correct, Your Honor. And I think Rahimi's language identifying and taking pains not to cast doubt on laws restricting those who present a heightened risk or a special danger, that's consistent with our argument here. If you look at these historical laws that we've identified, legislatures had identified a heightened risk when 18 to 20-year-olds obtain handguns without their parents' supervision. That's the same risk that you see in the federal law. That's another way that this... That's not good, hasn't it? Your Honor, that is another way that this analogy is well within the bounds established... By definition, all 18 to 21-year-olds are more dangerous. Now, you know that women aren't. Your Honor, the history shows that legislatures get to draw these kind of categorical age qualifications. Again, there's just no dispute that some qualifications like that are permissible. And if I can just turn to the other side's new sort of principles-based argument for a second, there's a couple problems with that. One is that it's inconsistent with their theory about militia laws, right? They're just totally different theories about this, how this history should work. The second problem with their principles-based argument is it's just not grounded in the history. There's no evidence that anyone in these historical periods thought that age qualifications were contingent on 18 to 20-year-old status as minors for purposes of some other activity. That's just not what the history shows. Legislatures were concerned about heightened risk, and they acted accordingly, just as they do today. At the founding, they required 18-year-olds to show up for militia duty with their own gun. So respectfully, Your Honor, that's not what Rahimi did. I mean, Rahimi didn't look at militia laws and say- I don't know. Well, because they weren't relevant. They are very relevant in this. I mean, I don't think you can honestly discard the 1791 or 1792 Militia Act. Your Honor, the problem, the fundamental problem with the militia evidence that the other side has pointed to is that using a musket in a highly supervised context doesn't imply a right outside of that supervised context to have a handgun. You're talking about the importance of age qualifications, and 18-year-olds had to produce their own weapons for the militia. So, Your Honor, respectfully, I disagree with a couple of the factual premises in there, so if I can just unpack two of them. One is that militia laws were always at 18. The age actually fluctuated, so we pointed to Virginia- Not under the federal law. It did under the federal law as well, Your Honor. So we pointed to the highest court of Massachusetts issued an opinion saying, yes, of course, if states want to, they can go up to 21 under this law. And I think that's consistent with our argument that both at the founding, even in these militia laws, 21 was within the accepted range. It was also within the accepted range, of course, when legislatures got around to codifying these kind of age qualifications. Related to that, I thought I heard my friend on the other side acknowledge that firearms technology changed dramatically in this period. Handguns at the founding were expensive. They were rare. They were very hard to use. As they grew more lethal and more common in the 19th century, that's when we see these kind of age qualifications emerge. So that our full historical story- Well, I don't think anyone would disagree that most firearms of the 18th century are nothing compared to the quality and the lethality of handguns today. So that argument proves way too much. I don't think that's right, Your Honor. I think Rahimi pointed out that, of course, as you note- Rahimi had to do with domestic violence disarming from any kind of firearm a person who, and it's temporary, isn't it, who is under domestic violence order. Any firearm. This is singling out a particular firearm for a certain kind of sales. So, Your Honor, we're not suggesting that the particular law upheld in Rahimi is the same as this one. No, but you're using Rahimi to embroider at a very high level of specificity what you say are the considerations in Rahimi. Your Honor, I think these are the teachings of Rahimi. I mean, Rahimi didn't identify a domestic violence law from the founding. You know I'm very well aware of that. I appreciate that, Your Honor. I think Rahimi provides a guide. It provides an example for the kind of analogies that are enough. And in our view, these 20 laws, I mean, they span all the regions of the country. They're accepted by courts, by commentators, by the public. There's no evidence that anyone challenged them throughout this very long period. I mean, in many ways- You haven't challenged any gun laws, really, for a long time, right? That's right, Your Honor. I mean, the piece of sort of litigation evidence that we have is the Tennessee Supreme Court's in Calicut, which upheld a law that is really very difficult to distinguish from the federal law at issue here. You know, it was focused on 18 to 20-year-olds. It was focused on handguns. So all of the evidence that we have from this history is showing that these laws were viewed as permissible. Do you have any historical evidence on the use of pistols in cavalry, in mounted units in the Revolutionary War, cavalry or dragoons, and whether or not persons between the ages of 18 and 21 were allowed to be in those units and therefore had to use pistols? Your Honor, I don't have any history on cavalry units in particular. What I can tell you is that even with respect to muskets, they were expensive. We've cited- How did Alexander Hamilton die? I believe he was shot in a duel, Your Honor. Not with a long gun. That's true, Your Honor. Obviously, there were handguns. There were duels. There were a lot of duels, which is why a lot of legislatures had to ultimately outlaw dueling. Your Honor, there were duels. And they didn't use long guns to shoot at each other. Your Honor, I'm not sure that the other side has suggested that the duels would somehow be relevant to the historical inquiry here. The guns were so inaccurate that they couldn't- that they were worthless or whatever as compared to today. Your Honor, that's what the evidence reflects. I mean, we've cited sources that point out those limitations on handguns. I don't- I haven't understood the other side to dispute that. I'm far from an expert on era duels. I mean, my understanding was that you've stood very close together and that they still often miss. So that might actually be evidence at this point that the technology really has changed over time. I also wanted to point- Oh, go ahead. Thank you. I'm puzzled because it seems to me that your whole argument is premised on some idea that Rahimi changed the landscape quite a bit. And the majority of the court- I mean, I think the whole court, actually, on this point said that Bruin is still the test. And would you be arguing if we- under Bruin that- I mean, I guess you did. But what argument- it doesn't seem that you actually have a basis to argue because we don't have the historical analogs that we had in Rahimi. It doesn't- I don't understand your argument. So can you maybe help? Of course, Your Honor. Thank you. So Rahimi, of course, is applying the Bruin test that clarifies that test in a couple ways. One is this focus on historical principles. The historical principle that we've identified is that age qualifications are permissible. You can think of that as reasonable age qualifications. You can think of that as 18 to 21. Either way, these restrictions are permissible. Your Honor asked about what our historical evidence is for that. We've discussed at length these post-ratification sources. Justice Kavanaugh's concurrence and Justice Barrett's concurrence explain why those sources are important. From the founding, I'll highlight three categories of evidence that we haven't discussed in detail yet. One, of course, is the age qualifications on other activities. Two is the absence of any evidence that anyone thought these kind of qualifications were impermissible. Well, doesn't the absence of law mean that you had freedom? So, Your Honor, I would point you to Justice- I mean, I'm a little- I sort of resent this argument that you have certain qualifications and that made it permissible. We live in a society where the presumption is freedom unless the people have determined through their legislators to limit freedom. Your Honor, the goal of Bruin and Rahimi's historical inquiry is to figure out what the ratifiers would have permitted. That's necessarily a larger category than what they actually did. Legislatures today don't go to the full extent of their authority. If you have minimal evidence of limitations, then you have maximal evidence of freedom. Your Honor, I think both Rahimi- For the exercise of rights, personal rights. Your Honor, to the extent that's a way of saying that, you know, silence should be dispositive in a case like this. I mean, that's not what Rahimi does. Again, we just didn't have a domestic violence law. The point of disagreement between the majority and Justice Thomas is at what level of generality do you apply the history as relates to that particular question. I mean, there's no doubt that Mr. Rahimi was a bad facts case and that people's, you know, you can generalize domestic. I may not agree with that, but I'm overruled that domestic relations orders of that sort reflect the propensity for dangerousness. You can't really generalize back to the 18th century that 18 to 20 year olds represented a propensity for violence. I respectfully disagree, Your Honor. I mean, the fact that as soon as legislatures started to write these laws down, these age qualifications, that they did almost exactly what Congress does. Less than that, Your Honor. I mean, I think we're, our earliest started in the 1850s and so 60 years. You have one in the 1850s, right? I believe that's right, Your Honor. I mean, that no one thought of that law as a problem. 20 laws joined it today. 30 plus states have similar laws. I mean, I think one problem with their approach is that it takes what legislatures have been doing for most of American history and makes it irrelevant to this test, which is supposed to be all about history. That's not what Rahimi supports. It's all about the original history of the Second Amendment. It's not about the evolving standards of justice. Quite different, right? Your Honor, of course, this is about the history of the Second Amendment. I guess we've talked about the problems with their militia-based evidence. Other than that, that's really all the history that they have. We're the ones who are putting before the court age qualifications that are most closely related to the restrictions that are at issue here. Why doesn't this run afoul of Justice Barrett's warning that post-ratification history unmoored from original meaning is not binding law in this context? Your Honor, Justice Barrett explained that there are a couple scenarios where post-ratification history can be important, and let me explain. But it seems to be unmoored here. Unmoored. It's unmoored from the original meaning here. I disagree with that, Your Honor. I mean, these were people within a lifetime or two of the founding. It wasn't as though there was some founding era evidence that, no, the reason legislatures didn't pass these kind of age qualifications on arms, the reason is that we think that would be some kind of Second Amendment problem. The other side hasn't identified any ratifier, really any evidence from the founding that they thought these kind of laws would be impermissible. And Justice Barrett also pointed out the problems with assuming that legislatures acted to the maximum extent of their authority. She said that would be an error and that the courts need to look at the history at a higher level of generality than that. But not at the highest level where you could say someone is just not responsible, which is what Rahimi rejected. That's right, Your Honor. Rahimi rejects responsibility as a label. What the court took pains not to reject was this idea that legislatures can restrict arms bearing by groups that present a special danger or a heightened risk. Congress identified this as group as did historical legislature. I'll pose one other question. One of the points made in the Connolly opinion on marijuana users was that, gosh, it was overbroad to say that marijuana users as category may not have firearms. In other words, you're suggesting that you can use history for certain purposes, and they showed in Connolly that alcohol was profusely available and consumed in earlier years, and yet the limits on anyone bearing arms who might have alcohol possession or alcohol use were very slim, right? So, Your Honor, obviously the government disagrees with aspects of the analysis in Connolly. Really? Okay. Your Honor, Judge Bark still had asked before about this court's recent decisions, so maybe I can address those. I think Diaz applies Rahimi's historical tests at recognizing that the court focused on principles and recognized that there were important clarifications to that test. We've discussed some of those clarifications today, and they support the government's position here. I recognize that I'm out of time, but I'm happy to answer any further questions the court may have. Okay. Thank you. Okay, Mr. Ohlendorf, do you not rely on the Militia Act anymore? We certainly rely on the Militia Act, Judge Jones, and with respect to that question specifically, I mean, Your Honor knows the history probably better than I do on this point, but I my friend invoked the Massachusetts law. I think that's just a fundamental misunderstanding of the relationship between the general militia and the select militia, right? The fact that 18-year-olds were part of the general militia doesn't mean that every state has to enroll all of the general militia within its specific militia, but it's the general militia, the total body of 18-year-olds and up who are male and capable of bearing arms, that the people protected by the operative clause of the Second Amendment at least has to cover them, notwithstanding the specific makeup of a select militia in a particular state. I don't think I heard my friend identify anything in Rahimi that's actually new, Judge Elrod. I think you drew attention to this. To my mind, Rahimi is really a move on the Supreme Court from kind of the fundamental in Heller and McDonald and Bruin to the mundane, right? We're taking the principles we've established in these cases and we're applying it in very specific cases now. I think the closest my friend got is to say, well, Rahimi calls for a principles-based approach. I think basically every word in Rahimi about the principles-based approach was a quotation of Bruin. I mean, Bruin itself was crystal clear that you look at the principles, you try to figure out whether there's a sufficient analog. It doesn't have to be a historical twin, but you have to have something. I mean, I would take a second cousin once removed, right? The government doesn't have that in this case. It has no age-based restrictions at the founding. My friend invoked Justice Kavanaugh's separate opinion in Rahimi. That opinion is obviously, as the Court pointed out, not controlling here. And, you know, I guess we're going to find out eventually most likely where Justice Kavanaugh is at on this, but I really don't read anything in that opinion that's contrary to my view of how to use history. Talking about you use the tradition part whenever, you should say that they're not going to discriminate, you know, that the reconstructive amendments, reconstruction amendments matter, and that America is not a discriminating place, so you shouldn't use things that are discriminating. Isn't that the point that he's making with that? I think it is, Judge Elrod. And, I mean, he at length quotes from and invokes Justice Scalia's views on tradition, you know, one of the architects of originalism. So I think it's pretty far-fetched to say that he saw, you know, tradition as something that could be used contrary to original meaning. In fact, he specifically said on star page 1912, note 2, that the historical approach applies when the text is vague, but the text of the Constitution always controls, and history, contrary to the text, is not to be followed. He said on star page 1916, that post-ratification interpretations, they're really only valuable when they're reasonably consistent and long-standing. I think the thrust of Justice Kavanaugh's use of tradition is where the meaning of the text and the founding era history run out. We can look at tradition, and this is what Justice Scalia in his writings has always said, we can look at tradition as kind of the final backstop, as a better source of law than a judge's own intuitions. But if it's contrary to the founding era history and the meaning of the text, it obviously doesn't control, and that's precisely the case that we have here. At the founding, again, there's no age-based restriction on firearm use of any kind until 60 years after ratification, and we know from the militia, they had to have their own private arms. We know from the absence, Judge Jones, of any restrictions on them keeping and bearing them, that they kept them in the home and were free to carry them outside the home, as many of the founders did as young children. Is this another situation where the Supreme Court could say, well, it's okay to have a categorical law like this, but it's subject to as applied challenges? I don't think so, Judge Jones, and number one, I don't think Rahimi says anything to justify the use of categorical disarmament, period. The court leaves untouched, to be sure, that question, but it goes to great lengths to say that the two traditions, the surety laws and the going armed laws, they both involved an individualized determination of dangerousness. Well, but so Rahimi does not exclude the possibility of as applied. And it doesn't, even in that context, where there is an individualized determination, it doesn't exclude the possibility of an as applied challenge, that's right, but I don't think it says anything to support the idea that the government can, just based on the legislature's say-so, disarm an entire group of people. And even if that were so, I would think it would have to be, Judge Jones, because there's something inherent in membership in the group that renders the person dangerous, right? One can imagine a group of people who are adhering to the enemy on domestic soil, right, akin to loyalists at the founding. Well, it's sort of by definition in a wartime that if you're a member of that group, then you pose a danger with the use of firearms. No one thinks that the fact that someone is 18 renders that individual person dangerous. All right, I think that we have no more questions. Thank you very much. Thank you, Your Honor. Thank you. We'll stand in recess until 10.30, 11, 10.30.